IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| CHAVONYA WATSON, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 13-0362-CV-W-ODS ) |
| HEARTLAND HEALTH LABORATORIES, INC. and MICHELLE GAUNT, | ) ) ) ) ) |
| Defendants. | ) |

## ORDER AND OPINION GRANTING DEFENDANT HEARTLAND HEALTH LABORATORIES, INC.'S MOTION FOR SUMMARY JUDGMENT

Pending is Defendant Heartland Health Laboratories, Inc.'s Motion for Summary Judgment (Doc. # 36). The Motion is granted.

## I. BACKGROUND[1]

Defendant Heartland Health Laboratories, Inc. ("HHL") is a long-term care laboratory provider. It provides laboratory services, including taking blood draws, for patients at various facilities, including Plaza Manor. From June 18, 2012, to September 24, 2012, Plaintiff Chavonya Watson ("Watson") was employed by HHL as a route phlebotomist and was assigned a route that included Plaza Manor. Charles Ramsey ("Ramsey") was a patient at Plaza Manor.

On September 10, 2012, while Watson was beginning to draw Ramsey's blood, Ramsey touched Watson between her legs, grabbed her crotch, and grabbed the back of her head and tried to kiss her. Soon after, Watson reported the incident to her team

---

[1] The facts of this case are derived from both parties' statement of facts which are uncontroverted unless otherwise indicated. For the facts that have been controverted, they are viewed in the light most favorable to Watson, the non-moving party. Immaterial facts have been omitted. The Court will not cite to the Record for those facts that have not been controverted. For those facts that have been controverted, the Court will cite to the Record.

lead, Michelle Gaunt ("Gaunt").  Gaunt reported the incident to Watson's supervisor, Tina Akers ("Akers").  Gaunt Dep. 27:16-21.  The incident did not require medical attention, counseling, or result in any physical injury or any noticeable marks.  Prior to this incident, there was nothing Ramsey did that Watson considered harassment.

That afternoon, HHL put a "male only" alert in their system for any HHL employee who was asked to provide Ramsey with medical services.  Anyone providing Ramsey with medical services would know that only males should attend him.  Thereafter, every time Watson went to Plaza Manor there was a "male only" alert in the system concerning blood draws for Ramsey.  Watson agrees that HHL took prompt action to make sure she never again provided Ramsey with medical services.  Subsequent draw lists indicate that Ramsey was taken care of by Robert McKee and never by a female.

Watson contends she requested a route change following the incident, but that Akers denied the request and told Watson that if she did not execute her route then Watson would not have a job.  Watson Dep. 222:12-19.  Watson also contends she was told she would not get a transfer because she only had an issue with one person and not the whole facility.  Watson Dep. 223:16-18.

Watson recalls the following six additional encounters she had with Ramsey following the September 10, 2012 incident: On September 11, 2012, Watson saw Ramsey in the hallway.  He was "belligerent" with her for a few seconds and said she was "just a bunch of bitches and nigger bitches."  Watson Dep. 113:10-114:5.  Following the encounter, Watson went to the nurses' station and "just went about [her] business." Watson Dep. 115:15-19.  Ramsey did not follow her to the nurses' station.  Watson Dep. 115:20-22.  Hours later, when Watson returned to HHL, she reported the incident to Gaunt.  Watson Dep. 116:14-16; 117:3-16.  In discussing the incident, Watson testified she was venting about what happened and did not expect Gaunt to take direct action.  Watson Dep. 118:6-11.  Watson avers she also told Akers about the incident at some point.  Watson Dep. 118:12-18.

Thereafter (Watson cannot remember the day or date), Ramsey saw Watson when she got off the elevator and told her "they were going to put him out."  At this point, Watson did not know what Ramsey meant by this.  Watson Dep. 121:7-19. Sometime later, Watson believed this to mean Ramsey was going to leave the facility.

2

Watson Dep. 125:13-19.  At some point, Watson also understood Ramsey would be leaving Plaza Manor, but she was not sure when.  Watson Dep. 124:23-25.

The third incident occurred a few days later.  Ramsey saw Watson and said to another patient (but loud enough for Watson to hear) "this bitch is getting me put out."

The next incident occurred when Ramsey saw Watson from his doorway and he stared at her for ten minutes while she was at the nurses' station.  During this time, Ramsey did not sexually or racially harass Watson in any way.  Watson Dep. 128:8-13.

At some date between September 10, 2012, and September 21, 2012, Ramsey got a roommate and Watson was assigned to do a blood draw for the roommate.  When she got to the door, she realized it was Ramsey's room and he said, "What the fuck are you doing over here?"  Watson immediately left and went to the nurses' station and indicated she was not going to draw Ramsey's roommate.  Watson told Gaunt about the situation and Gaunt said she would get someone else to do the blood draw.  Watson also suggests Gaunt told her she would be written-up for not drawing Ramsey's roommate's blood.  Watson Dep. 186:22-187:13.  Watson was never shown a write-up on this and never asked to sign one.  Watson Dep. 186:22-187:22.  Gaunt did not tell Watson she had to draw Ramsey's roommate in the future and Watson never drew blood for a roommate of Ramsey's.

The final encounter occurred on September 21, 2012.  While Watson was waiting for the elevator, Ramsey said to her, "they're putting me out, bitch.  I'm going to get you."  Watson suggests she told Gaunt about the incident but no one else.

Ramsey never physically touched Watson following the September 10, 2012 incident.  Although Watson contends Ramsey would say or gesture something sexual or racial toward Watson everyday she worked after September 10, 2012, not all of the incidents described by Watson involve anything sexual or racial.  Watson Dep. 120:10-121:2 (Ramsey said "they're going to put me out"); 123:9-19 (Ramey said he was "getting put out"); 126:14-127:8 (Ramsey stared at Watson, but did not say anything).  Further, the deposition cites referenced by Watson do not describe any inappropriate gestures made by Ramsey toward Watson.  Watson Dep. 126:16-25; 129:1-11.

Watson asserts she called Gaunt multiple times from Plaza Manor's garage parking lot crying before starting her shift because she was scared of Ramsey.  Watson

3

Dep. 218:9-219:23. Further, Watson claims she was told "it comes with the territory" and "you just got to roll with the punches" after reporting that Ramsey called her a "nigger bitch." Watson Dep. 203:18-25; 222:1-7; 223:10-18. At this point, Watson contends she realized no changes would be made by HHL. Watson Dep. 223:10-18. Watson admitted that if Ramsey would have left Plaza Manor her problem would have been alleviated. Watson Dep. 231:8-24. Ramsey left Plaza Manor on or before September 24, 2012.

Watson received two write-ups in September 2012. On September 13, Watson received a write-up from Akers, which was signed by Watson without comment. Watson Dep. 174:10-25. The specifics of the write-up are not detailed, and the write-ups are not part of the Record. However, Watson admits that the warning accurately described what happened. Watson Dep. 175:1-18. Watson also contends she did not put any comments on the write-up because she provided Akers verbal explanation. Watson Dep. 175: 1-18. On September 18, Watson received another write-up for an incident that occurred at a facility other than Plaza Manor. This write-up is also not in the Record but Watson testified there was nothing inaccurate in the write-up, and that she verbally explained to Akers that "that's not the way it happened." Watson Dep. 177:7-17; 178:19-21. Watson signed the write-up without comment. Watson's pay was not docked due to the write-ups, nor was she ever told not to report to work, nor were her job assignments changed in any way. Watson Dep. 179:20-180:1.

On September 18, Watson had her 90-day review. Watson was expected to work 40 hours per week. However, during her tenure at HHL, there were a number of weeks Watson worked less than 40 hours. During the review, it was mentioned that Watson had missed a significant amount of work during her first 90 days and as a result, HHL extended her probationary employment time. Watson Dep. 180:17-181:18. Watson was "completely fine" with the extended probationary period and the reasons for the extension. Watson Dep. 182:18-21.

By September 24, 2012, Watson believed she had no choice but to quit. Watson Dep. 225:15-227:16. That day, Watson sent a text to someone at HHL indicating that her tire blew out and she would be in later that day. Following the text, HHL made repeated efforts to contact Watson and she made no effort to return those calls. She

4

did not show up for work on September 24, September 25, or September 26, nor did she call and indicate that she was not going to work on any of those days. HHL tried to reach Watson over the next few days and left voice messages to find out where she was. Watson did not respond to any of the calls from HHL. It is HHL's position that Watson voluntarily resigned her position due to her failure to call or report for multiple days beginning September 24, 2012. Watson would still have a job if she had not resigned.

Watson's state-court Petition for Damages ("Complaint") (Doc. # 1-1) contains four counts brought under the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. §§ 213.010 *et seq.*:

- Count I—Sexual Harassment (Hostile Work Environment)
- Count II—Racial Harassment (Hostile Work Environment)
- Count III—Sexual Harassment (Quid Pro Quo)
- Count IV—Retaliation

The Court now considers HHL's Motion.

## II. STANDARD

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See generally Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted). In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 588-89 (1986); *Tyler v. Harper*, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985).

III. DISCUSSION

HHL moves for summary judgment on Watson's sexual and racial harassment hostile work environment claims (Counts I and II), sexual harassment quid pro quo claim (Count III), and Watson's retaliation claim (Count IV). The Court will address each Count in turn.

A. Counts I and II—Sexual and Racial Harassment (Hostile Work Environment)

Claims for hostile work environment under the MHRA are analyzed under the same standard used for federal claims of harassment. *LeGrand v. Area Resources for Community and Human Services*, 394 F.3d 1098, 1101 (8th Cir. 2005) ("We analyze [plaintiff's] hostile work environment claims under both Title VII and the MHRA in the same manner."); *Duncan v. General Motors Corp.*, 300 F.3d 928 (8th Cir. 2002) ("We analyze [plaintiff's] claims under Title VII and the MHRA using the same legal principles."); *see also Alhalabi v. Missouri Dep't of Natural Resources*, 300 S.W.3d 518, 525 (Mo. Ct. App. 2009) ("In deciding a case under the MHRA, appellate courts are guided by both Missouri law and federal employment discrimination case law that is consistent with Missouri law.") (citing *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818 (Mo. 2007) (en banc)). Thus, this Court will look to both Missouri and Eighth Circuit employment case law that is consistent with Missouri law for guidance.

Watson alleges she was sexually and racially harassed by Ramsey and raises two claims for hostile work environment. In evaluating a hostile work environment claim, the same standards are used whether it is based upon sexual harassment or racial harassment. *Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 578 (8th Cir. 1999). To prevail on a claim for hostile work environment brought under the MHRA, Watson must prove: (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) her membership in a protected group was a contributing

factor in the harassment; (4) a term, condition, or privilege of her employment was affected by the harassment; and (5) her employer knew or should have known of the harassment and failed to take appropriate action. *Alhalabi*, 300 S.W.3d at 527; *see LeGrand*, 394 F.3d at 110.

Courts consider the totality of the circumstances in determining whether a work environment is hostile. *LeGrand*, 394 F.3d at 1102. The harasser's "conduct must be extreme and not merely rude or unpleasant." *Id.* at 1101 (internal quotations omitted). "More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment." *Id.* (internal quotations omitted). Courts look to a number of factors in analyzing a hostile work environment claim, including: "the frequency of the discriminatory conduct; its severity; whether it is physical threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 1103.

Assuming Watson established the first three elements of her hostile work environment claims based on sexual and racial harassment, the Court will only address the fourth and fifth elements.

<u>1.</u>

To meet the fourth element of a hostile work environment claim, Watson must demonstrate the unwelcome harassment was "sufficiently severe or pervasive enough to alter the conditions of plaintiff['s] employment and create an abusive working environment." *Alhalabi*, 300 S.W.3d at 527. "The conduct must be sufficient to create a hostile work environment, both as it was subjectively viewed by the plaintiff and as it would be objectively viewed by a reasonable person." *Id.*

The Eighth Circuit has found summary judgment in favor of the defendant for the plaintiff's failure to meet the fourth element of a hostile environment claim based on sexual harassment brought under the MHRA. *See, e.g.*, *LeGrand,* 394 F.3d at 1102; *Duncan,* 300 F.3d 934. For example, in *Duncan v. General Motors Corp.*, an employee filed suit under the MHRA, alleging she was sexually harassed. The Eighth Circuit considered five harassing incidents: a proposition for a relationship; improper touching

of the plaintiff's hand on multiple occasions; a request that the plaintiff sketch a sexually objectionable planter; the posting of a "Man Hater's Club" poster; and a request that the plaintiff "type the He-Men Women Haters beliefs." 300 F.3d at 933-34. The alleged harasser also had a screen saver on his computer of a naked woman, a planter in his office that was shaped like a slouched man wearing a sombrero with a hole in the front of his pants allowing for a cactus to protrude, and a child's pacifier that he kept in his officer that was shaped like a penis. *Id.* at 931. The Court concluded that although the alleged harasser's actions were "boorish, chauvinistic, and decidedly immature" and made the plaintiff feel uncomfortable, the Court could not say they created an "objectively hostile work environment permeated with sexual harassment." *Id.* at 935.

In *LeGrand v. Area Resources for Community and Human Services*, the plaintiff filed sexual harassment claims against employer under both Title VII and the MHRA. The employee asserted that a harasser asked him to watch pornographic videos and "jerk off with him," grabbed his buttocks, "reached for" his genitals, "briefly gripped" his thigh, and attempted to kiss him. 394 F.3d at 1100. The district court granted summary judgment in favor of the defendant. *Id.* at 1101. On appeal, the Eighth Circuit affirmed and held that although the harasser's actions "ranged from crass to churlish and were manifestly inappropriate," they did not create a hostile work environment. *Id.* at 1102.

Viewing the facts most favorably to Watson, the Court finds that Watson has failed to establish a prima facie case against HHL for a hostile work environment based on sexual or racial harassment. The Record reveals that on September 10, 2012, Ramsey touched Watson between her legs, grabbed her crotch, and then grabbed the back of her head and tried to kiss her. This conduct is almost identical to the conduct in *LeGrand,* in which the harasser grabbed the plaintiff's buttocks, reached for his genitals, gripped his thigh, and tried to kiss him. As the Eighth Circuit held in *LeGrand*, this Court cannot find that this conduct creates a hostile work environment.

Following the September 10, 2012 incident, Watson never had direct contact with Ramsey; she had a few verbal contacts with him. Never again did Ramsey touch Watson, and never again was Watson required to provide Ramsey with medical services. On September 11, 2012, Ramsey was "belligerent" with Ramsey for a few seconds and called her "just a bunch of bitches and nigger bitches." This was

8

Ramsey's only race-related comment to which Watson cites. Although highly inappropriate, this one-time comment is not severe or pervasive enough to sustain a racially hostile work environment claim. *See Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 765, 759-60 (8th Cir. 2004) (finding that racial slurs that were "sporadic, no more than one per month," over a period of two years, some of which were "merely overheard" by the employee, were not so severe or pervasive to alter the terms or conditions of his employment); *Elmahdi v. Marriott Hotel Serv., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003) (holding insufficient to sustain hostile work environment claim the fact that plaintiff was called "black boy" on a few occasions by coworker).

Later, Ramsey told Watson "they were going to put him out." There is nothing racial or sexual about this comment. A few days later, Ramsey saw Watson and told another patient—but loud enough for Watson to hear—that "this bitch is getting me put out." On another occasion, Ramsey stared at Watson for ten minutes. Again, there is nothing racial or sexual about this. On a later date, Watson arrived at Ramsey's room to draw Ramsey's roommate's blood, and Ramsey stated: "What the fuck are you doing here?" Again, although rude, there is nothing racial or sexual about this question. Finally, on September 21, 2012, while Watson was waiting for the elevator, Ramsey said, "they're putting me out, bitch. I'm going to get you."

Ramsey's comments following the September 10, 2012 incident (including calling Watson a "bitch" on three occasions) cannot be said to be so severe or pervasive as to alter a term, condition, or privilege of Watson's employment. *Scusa v. Nestle USA Co.*, 181 F.3d 958, 964 (8th Cir. 1999) (nine incidents of unpleasant conduct and offensive comments were not "severe or pervasive enough so as to alter a term, condition, or privilege of [] employment"). Ramsey's few and inappropriate comments cannot be characterized as "extreme" and did not constitute "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the condition of [Watson's] employment and create an abusive working environment." *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Following the September 10, 2012 incident, Watson only cites to six incidents over a period of eleven days at most—half of which did not include any sexual or racial remarks. Although Watson contends she told Gaunt she was scared of

9

Ramsey, she does not point to anything in the Record establishing that Ramsey's comments interfered with her work performance. Finally, the only incident in which Ramsey threatened her (saying "I'm going to get you") occurred on September 21, 2012. The Record establishes that Ramsey left Plaza Manor three days later.

Watson relies on three Missouri court cases arising from a set of vastly different facts in an attempt to support her claim of a hostile work environment. Watson first cites to *Leeper v. Scorpio Supply IV, LLC.*, 351 S.W.3d 784, 790 (Mo. Ct. App. 2011), for the proposition that a hostile work environment claim can be established by the acts of grabbing the buttocks or hip. In *Lepper*, two female plaintiffs brought a hostile work environment claim based on sexual harassment against their male supervisor and other defendants. *Id.* at 787. The harasser's conduct toward the first plaintiff lasted for ten to eleven months, and his conduct toward the second plaintiff lasted four to five months. *Id.* at 789-790. The harasser's conduct toward the first plaintiff included the following: saying "I want to fuck you" and "I wouldn't mind getting a piece of . . .[your] rear end"; offering to go home with her and saying "an hour would be long enough to get some action"; rubbing his hands over her breasts and reaching inside her shirt and squeezing her breasts; making gestures with his tongue and hands to simulate oral sex; pulling her into a bathroom and sticking his hands down the front of her pants; and making her touch his penis. *Id.* at 788-89. The harasser's conduct toward the second plaintiff included the following: flicking his tongue to simulate oral sex; grabbing her hips and pulling her down onto his lap; trying to kiss her 20 times; touching her buttocks on several occasions; asking her to come by his hotel room; touching her buttocks; and showing up at her house unannounced 10 to 12 times. *Id.* at 789-90. This case is unlike *Lepper* because: (1) Ramsey was merely a patient and not a supervisor; (2) Ramsey's conduct only lasted for eleven days whereas the harasser's conduct in *Lepper* lasted for months; and (3) other than the September 10, 2012 incident (which HHL promptly took remedial action) Ramsey made a few inappropriate comments by calling Watson a "bitch" and "nigger bitch"—the conduct in *Lepper* was much more extreme, which clearly rose to the level of severe and pervasive sexual harassment.

Watson also points to *Cooper v. Albacore Holdings, Inc.*, 204 S.W.3d 238 (Mo. Ct. App. 2006) to support her hostile work environment claim. In that case, the plaintiff's

10

employer's CEO subjected her to embarrassment and humiliation at a dinner party by: touching her breasts, chest, thigh, torso, and arm though the use of a napkin; attempting to touch her several more times; suggesting that she take her shirt off; making comments about her undergarments; and asking her to go home with him. *Cooper* is unlike this case, because here, Ramsey was a patient and in *Cooper* the harasser was the plaintiff's employer's CEO.

Finally, Watson points to *Lynn v. TNT Logistics North America Inc.*, 275 S.W.3d 304, 308 (Mo. Ct. App. 2008). The harasser in *Lynn* was the plaintiff's supervisor and he told her she would not get paid "until you bounce your ass," he told her his plans for performing oral sodomy on her, and he told her about size of his genitalia. *Id.* at 307. The employer "ignor[ed] the conduct and [did] absolutely nothing to curb or punish the conduct of its supervisor." *Id.* at 308. In contrast, in this case, Ramsey was not a supervisor and HHL took prompt remedial action by ensuring that Watson would never provide medical services for Ramsey and put out a "male only" alert for anyone who would provide Ramsey with medical services.

The Court concludes that Watson has failed to establish the fourth element of her hostile work environment claims.

<u>2.</u>

Even if Watson had established the fourth element of her hostile work environment claim, she has still failed to establish the fifth element—that her employer knew or should have known of the harassment and failed to take appropriate action. "An employer is not liable if it takes prompt remedial action which is reasonably calculated to end the harassment once the employer knew or should have known about the harassment." *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 967 (8th Cir. 1999); *see also Barekman v. City of Republic*, 232 S.W.3d 675, 690 (Mo. Ct. App. 2007). In assessing whether the remedial measures were reasonable, courts consider a variety of factors including the amount of time that elapsed between the notice of harassment and the remedial measure, the options available to the employer (including disciplinary

11

action taken against the harasser), and whether or not the measures ended the harassment. *Stuart v. General Motors Corp.*, 217 F.3d 621, 633 (8th Cir. 2000).

Here, Watson complained about the September 10, 2012 incident and HHL promptly put a "male only" alert in the system for anyone who would provide medical services for Ramsey. Watson never again provided medial services for Ramsey following September 10, 2012. Watson agrees that HHL took prompt action to make sure she never provided Ramsey with medical services after she complained about his behavior. Following the September 10, 2012 incident, Ramsey never again physically touched Watson. The Court concludes that HHL's remedial measures were reasonable as they ended Ramsey's physical sexual harassment. Only a few hours elapsed from the time of the harassment to when the "male only" alert was put into HHL's system. There were not a lot of options available to HHL, as Ramsey was a patient, and not a co-worker or supervisor. The "male alert" clearly ended the physical harassment as Watson never again had any direct contact with Ramsey. Even if the events of September 10 created a hostile work environment—which is doubtful in light of *Duncan's* more egregious facts—the Court concludes that Watson has failed to establish the fifth element of her hostile work environment claim.

Watson contends that she also reported the conduct following the September 10, 2012 incident. The last incident occurred on September 21 in which Ramsey threatened "I'm going to get you." She admits that Ramsey leaving the facility would have alleviated her problems. The Record establishes that Ramsey left Plaza Manor on September 24, 2012. Had Watson not quit her job on September 24, 2012, she would have still had a job and Ramsey would no longer be at Plaza Manor.

The Court concludes that Watson has failed to establish a prima facie case of hostile work environment because (1) Ramsey's conduct was not sufficiently severe or pervasive that it affected the terms and conditions of employment; and (2) HHL took prompt remedial action to prevent recurrences of the more serious and inappropriate conduct. Summary judgment is granted in HHL's favor on Counts I and II.

B. Count III—Sexual Harassment (Quid Pro Quo)

In Count III, Watson seeks to recover for sexual harassment (Quid Pro Quo) under the MHRA, Mo. Rev. Stat. §§ 213.010 *et seq.* Watson alleges "Defendants took several disciplinary measures against Plaintiff and ultimately terminated Plaintiff's employment because she would not acquiesce to Ramsey's sexual harassment." Complaint, ¶ 74. However, despite its title, Count III really contends HHL constructively discharged Watson and the termination referred to in paragraph 74 of the Complaint was Watson's decision to quit.[2] *See* Complaint, ¶ 39 ("Plaintiff felt that she had been left with no choice but to quit, rather than be constantly subjected to harassment.").

"A person is constructively discharged when an employer deliberately renders an employee's working conditions so intolerable that the employee is compelled to quit his job." *DeWalt v. Davidson Service/Air, Inc.*, 398 S.W.3d 491, 501 (Mo. Ct. App. 2013). The working conditions must be intolerable to a reasonable person. *Id.* A constructive discharge claim requires "aggravating factors or a continuous pattern of discriminatory treatment." *Id.* An employee must give the employer a reasonable chance to resolve the problem. *Id.* Missouri courts use the following test for constructive discharge: "1) a reasonable person in the employee's situation would find the working conditions intolerable, and 2) the employer intended to force the employee to quit, or the employer could reasonably foresee that its actions would cause the employee to quit." *Id.*

Viewing the facts in a light most favorably to the non-moving party, Watson has failed to establish that she was constructively discharged. A reasonable person in Watson's situation would not find these working conditions intolerable. After the September 10, 2012 incident, HHL promptly put a "male only" alert in their system and made sure that Watson never again provided Ramsey with medical services. Ramsey never physically touched Watson again.

The other incidents in which Ramsey called Watson a "bitch" and "nigger bitch" (although inappropriate and offensive) cannot be said to render Watson's working

---

[2] HHL argues that Watson was considered to have voluntarily resigned her position due to her failure to call or report for multiple days beginning September 24, 2012. The record establishes that Watson would still have a job if she had not resigned.

conditions intolerable. Ramsey did not tell Watson he would "get her" until September 21, 2012. Watson contends she reported this incident to Gaunt, but she failed to give HHL an opportunity to remedy this problem before failing to report to work on September 24. Watson admitted that Ramsey leaving Plaza Manor would have alleviated her problem. Ramsey was still at Plaza Manor on the last day that Watson worked, but he left the facility on September 24, 2012. Had she returned to work on September 24, Ramsey would not have been there. Missouri law requires that the plaintiff "not to assume the worst, and not to jump to conclusions too quickly." *DeWalt*, 398 S.W.3d at 501.

The Court concludes that Watson has failed to establish that she was constructively discharged. The Court grants summary judgment in HHL's favor with respect to Count III.

### C. Count IV—Retaliation

Finally, Count IV of Watson's Complaint brings a claim for retaliation under the MHRA. To establish a prima facie case of retaliation under the MHRA, a plaintiff must prove that: (1) she complained of discrimination; (2) the employer took adverse action against her; and (3) a causal relationship existed between the complaint and the adverse action. *McCrainey v. Kansas City Missouri School Dist.*, 337 S.W.3d 746, 753 (Mo. Ct. App. 2011).

The Record establishes that Watson complained of the alleged discrimination. Thus, the Court will only address the second and third elements of Watson's retaliation claim.

#### 1. Adverse Employment Action

Watson asserts that the following constituted adverse employment actions: HHL's constructive discharge; two September 2012 write-ups; the extension of her probation period; and Gaunt's statement that she would be written-up for not drawing Ramsey's roommate. However, these do not establish an adverse employment action.

*See Shockensey v. Ramsey County*, 493 F.3d 941, 950 (8th Cir. 2007) (stating that adverse employment actions include demotions, suspensions, and terminations).

First, consistent with the Court's finding in Section III.B., Watson has failed to establish that she was constructively discharged. Thus, Watson cannot rely on her allegation of constructive discharge to meet the second element of her retaliation claim.

Next, Watson contends her two write-ups following the September 10, 2012 incident constituted an adverse employment action. The write-ups were signed by Watson without comment. These write-ups critiquing Watson's work performance cannot be viewed as an adverse employment action. *See Carptenter v. Nw. Airlines, Inc.*, 47 App'x 424, 426 (8th Cir. 2002) (employer's critique of employee's poor job performance was not an adverse employment action); *Spears v. Missouri Dep't of Corrections and Human Resources*, 210 F.3d 850, 854 (8th Cir. 2000) ("A poor performance rating does not in itself constitute an adverse employment action because it has no tangible effect upon the recipient's employment."). "An unfavorable evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Spears*, 210 F.3d at 844. Here, Watson presents no evidence that HHL subsequently used the write-ups to her detriment. Her pay was not docked, she was never told not to report to work, and her work assignments never changed. The Record reflects that Watson would still have a job if she had not resigned. Watson cannot rely on these write-ups to meet the second element of her retaliation claim.

Next, Watson contends that her extended probationary employment time was an adverse employment action. Watson had a 90-day review on September 18, 2012. During the review, it was mentioned that Watson missed a significant amount of work during her first 90 days, which resulted in an extension of her probationary employment time. Watson was okay with the extended probationary period and the reasons for the extension. Watson cannot establish that this extended probationary period resulted in anything to her detriment. Watson has failed to show that her extended probationary period constitutes an adverse employment action.

Finally, Watson contends she suffered an adverse employment action when Gaunt told her she would be written up for not drawing Ramsey's roommate. However,

Watson was never shown or asked to sign any write-up regarding this. Again, even if Watson was asked to sign this write-up, Watson has not presented any evidence that HHL used this to her detriment—her pay was not docked, she was never asked not to come to work, and her work assignments never changed. Watson has failed to meet the second element of her retaliation claim.

2. Causal Relationship/Contributing Factor

Even if Watson established that she suffered an adverse employment action, she has still failed to establish that her complaints of harassment were a contributing factor to any of the alleged adverse employment actions.

A plaintiff proceeding on a MHRA retaliation claim must prove that her opposition to unlawful discrimination was a "contributing factor" in her employer's adverse employment action. *Porter v. City of Lake Lotawana*, 651 F.3d 894, 898 (8th Cir. 2011) (citing *Wallace v. DTG Operations, Inc.*, 563 F.3d 357, 360 (8th Cir. 2009) (citing *Hill v. Ford Motor Co.*, 277 S.W.3d 659, 665 (Mo. 2009))). A "contributing factor" is one that "contributed a share in anything or has a part in producing the effect." *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 867 (Mo. Ct. App. 2009) (quoting *McBryde v. Ritenour School Dist.*, 207 S.W.3d 162, 170 (Mo. Ct. App. 2006)).

Watson points to the two September write-ups that she received three days and eight days after her initial complaint on September 10, 2012. However, "[m]ore than a temporal connection between an employee's protected conduct and the adverse employment action is required to create a genuine factual issue on causation." *Hesse v. Avis Rent A Car System, Inc.*, 394 F.3d 624, 633 (8th Cir. 2005). Watson cannot just rely on the close proximity between her complaint and the write-ups—there has to be something more.

Watson also contends that a reasonable jury could find a causal connection because HHL took no remedial action other than the "male only" alert. Watson contends that HHL's failure to act essentially condoned Ramsey's conduct. Again, the Record reflects that other than the inappropriate name-calling and statements that Ramsey would be "put out," Ramsey's only other comment (and last comment) to

Watson occurred on September 21, 2012, when he said "I'm going to get you." Watson agreed that Ramsey leaving the facility would have solved her problem. Ramsey only remained at Plaza Manor for four more days—the same day Watson did not show up for work because she felt she had no choice but to quit. An employee must give an employer a reasonable chance to resolve the problem. See *DeWalt*, 398 S.W.3d at 501.

The last thing to which Watson points to establish causal connection is that after informing HHL that she was called a "nigger bitch," she was instructed that it "comes with the territory" and to "roll with the punches." A reasonable jury would not find that this establishes that her complaints of harassment were a contributing factor to any of her alleged adverse employment actions.

Watson has failed to establish a prima facie case of retaliation under the MHRA. Summary judgment is granted in HHL's favor with respect to Count IV.

## IV. CONCLUSION

Defendant HHL's Motion for Summary Judgment is granted in its entirety.

IT IS SO ORDERED.

DATE: May 14, 2014

/s/ Ortrie D. Smith
ORTRIE D. SMITH, SENIOR JUDGE
UNITED STATES DISTRICT COURT